## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

**NAUTILUS INSURANCE COMPANY,**

     **Plaintiff,**

     **v.**                           **Case No. 2:19-CV-02624-JAR-KGG**

**HEARTLAND BUILDERS, LLC, JACK
REDMAN III, and KARIE REDMAN,**

     **Defendants.**

## MEMORANDUM AND ORDER

This matter concerns whether two Commercial General Liability ("CGL") insurance policies Plaintiff Nautilus Insurance Company ("Nautilus") issued to Defendant Heartland Builders, LLC ("Heartland") provide coverage for damages awarded against Heartland in an arbitration proceeding brought by Defendants Jack Redman III and Karie Redman ("the Redmans") and confirmed by order of a Kansas state court. Now before the Court is Nautilus's Motion for Partial Summary Judgment (Doc. 35). Nautilus seeks judgment in its favor on Counts I, II, III, V, and VI of its Amended Complaint and on Heartland's Counterclaim for breach of the policies at issue. The motion is fully briefed, and the Court is prepared to rule. For the reasons set forth in detail below, Nautilus's motion is found as moot in part, granted in part, and denied in part.

### I.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[1] In applying this standard, the Court views the evidence and all reasonable inferences therefrom

---

[1] Fed. R. Civ. P. 56(a).

in the light most favorable to the nonmoving party.[2]  "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[5]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[6]  In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[7]  To prevail on a motion for summary judgment on a claim upon which the moving party also bears the burden of proof at trial, the moving party must demonstrate that "no reasonable trier of fact could find other than for the moving party."[8]

Once the movant has met the initial burden of showing the absence of a genuine dispute of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that

---

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1210 (10th Cir. 2008)).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[4] *Wright ex rel. Tr. Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Adler,* 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[7] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

[8] *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015).

there is a genuine issue for trial."[9]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[10]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[11]  In setting forth these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[12]  To successfully oppose summary judgment, the nonmovant must bring forward "more than a mere scintilla of evidence" in support of its position.[13]  A nonmovant "cannot create a genuine issue of material fact with unsupported, conclusory allegations."[14]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[15]

## II.    Uncontroverted Facts

Guided by the foregoing framework, the Court turns to the parties' statements of fact. The following material facts are either uncontroverted, stipulated, or viewed in the light most favorable to the non-moving party.

---

[9] *Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[10] *Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[11] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady,* 590 F.3d at 1169.

[12] *Adler*, 144 F.3d at 671.

[13] *Vitkus v. Beatrice Co.,* 11 F.3d 1535, 1539 (10th Cir. 1993).

[14] *Tapia v. City of Albuquerque,* 170 F. App'x 529, 533 (10th Cir. 2006) (citing *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1237 (10th Cir. 2004)).

[15] *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

A.      **The Nautilus Policies**

Nautilus issued two CGL insurance policies to Heartland—Policy No. NN698532 for the

term of July 25, 2016 to July 25, 2017, and Policy No. NN829173 for the term of August 11,

2017 to August 11, 2018 (the "Policies").  The language of the two Policies is identical except

for the policy term.  Both Policies provide, in part:

> **COMMERCIAL GENERAL LIABILITY COVERAGE FORM**
> ...
> **SECTION I – COVERAGES**
>
> **COVERAGE A BODILY INJURY AND PROPERTY
> DAMAGE LIABILITY**
>
> 1.      **Insuring Agreement**
>
> > a.      We will pay those sums that the insured becomes
> > legally obligated to pay as damages because of
> > "bodily injury" or "property damage" to which this
> > insurance applies.  We will have the right and duty
> > to defend the inured against any "suit" seeking
> > those damages.  However, we will have no duty to
> > defend the insured against any "suit" seeking
> > damages for "bodily injury" or "property damage"
> > to which this insurance does not apply.  We may, at
> > our discretion, investigate any "occurrence" and
> > settle any claim or "suit" that may result. . . .
> > > …
> >
> > b.      This insurance applies to "bodily injury" and
> > "property damage" only if:
> >
> > > (1)      The "bodily injury" or "property damage" is
> > > caused by an "occurrence" that takes place
> > > in the "coverage territory";
> > >
> > > (2)      The "bodily injury" or "property damage"
> > > occurs during the policy period; . . . .[16]
> >
> > > …

---

[16] Doc. 7-6 at 18; Doc. 7-7 at 18.

The language of the Policies' exclusions, definitions, and limitations is not in dispute and is set forth below as necessary throughout the Court's analysis. The Policies each provide $1,000,000 of general liability coverage per occurrence, subject to a $2,000,000 general aggregate limit and a $1,000 per-claim deductible for bodily-injury and property-damage liability combined.

**B.      Arbitration Proceeding, State Court Action, and Interim Award**

The Redmans hired Heartland to design and construct a new home for them in Hutchinson, Kansas after they lost their previous home in a wildfire. The Construction Agreement, executed on May 1, 2017, provided that the general scope of Heartland's work would include "electrical rough in, plumbing rough in, structure to Drywall stage."[17] The project did not go smoothly, to say the least, and Heartland ultimately abandoned the project.

On March 9, 2018, the Redmans filed an Arbitration Demand with the American Arbitration Association relating to Heartland's allegedly faulty construction of their home, bringing claims for breach of contract, negligent construction, negligent misrepresentation, fraud, unjust enrichment, and violation of the Kansas Consumer Protection Act ("KCPA"). The Arbitration Demand sought monetary damages of $500,000 to $1,000,000.

On March 20, 2018, the Redmans filed a lawsuit against Heartland in the Twenty-Seventh Judicial District of the District of Reno County, Kansas, Case No. 2018-cv-000090 ("Redman Lawsuit"). That action arose out of the same facts at issue in the Arbitration Demand and included claims for fraud, negligent construction, negligent misrepresentation, unjust enrichment, and deceptive and unconscionable acts under the KCPA. The Redman Lawsuit sought damages in excess of $75,000, attorneys' fees and costs, and post-judgment interest.

---

[17] Doc. 7-3 at 5.

On June 11, 2018, Nautilus acknowledged receipt of the Arbitration Demand and Redman Lawsuit.  Nautilus agreed to and did defend Heartland in both proceedings.

On July 17, 2019, the Arbitrator, Jerome Bales, entered an Interim Award in favor of the Redmans, awarding them: (1) $103,964.69 for Heartland's breach of the Construction Agreement; (2) $173,490.69 for Heartland's negligence and negligent misrepresentation in connection with construction deficiencies; (3) $20,000 for Heartland's violations of the KCPA; and (4) reasonable attorneys' fees.  In arriving at this result, the Arbitrator relied on the report of Brandon Fuqua, P.E., the Redmans' structural engineering expert, estimates from contractor Chris Miller, other expert reports and testimony, and the testimony of fact witnesses.  Each category of damages awarded in the Interim Award is addressed below.

### 1.      Breach of Construction Agreement

In the Interim Award, the Arbitrator determined that the Construction Agreement was ambiguous as to whether it was a cost-plus or fixed-price arrangement, interpreted it in favor of the Redmans, and found that it provided that Heartland would construct the shell of the Redmans' home for "$225,000 plus 10% profit, plus sales tax."[18]

The Arbitrator determined that Heartland had out-of-pocket costs of $199,778.50 for its work on the Redman home.  After allowing 10% for overhead in addition to 10% for profit, the Arbitrator found that the total cost of the work was $241,731.99.  However, the Redmans paid a total of $345,696.67.  The Arbitrator therefore found that Heartland breached the Construction Agreement by overcharging the Redmans by $103,964.69.

---

[18] *Id*. at 2.

2.     **Negligence and Negligent Misrepresentation Resulting in Construction Deficiencies**

The Arbitrator evaluated the reports and testimony of experts and the testimony of fact witnesses regarding what the Redmans claimed were numerous deficiencies in the construction of the house, ultimately concluding "that the Redmans' experts [were] correct on the more significant issues" and making a number of findings in favor of the Redmans.[19]

First, the Arbitrator determined that Heartland's framing subcontractor improperly notched (or "birdsmouth cut") the TJI roof rafters at the bearing walls to make them fit the height of the exterior walls, with the approval of Heartland's on-site supervisor, Ralph Dohner, but contrary to the manufacturer's instructions prohibiting such notching.  The Installation Guide for the TJI joists expressly "states that each TJI's 'flange must fully bear on [the top] plate' and the 'birdsmouth cut must not overhan[g] [the] inside face of [the top] plate.'"[20]  Because the subcontractor improperly notched the joists, "the flanges of the TJI joists do not fully bear on the top plate."[21]  The Interim Award also states that "[t]he doors and windows installed by Heartland were not consistent with what the Redmans wanted."[22]  The Arbitrator determined that "all of the upper framing, roofing, doors and windows need[ed] to be removed, down to the level of the basement framing."[23]  In so finding, the Arbitrator relied on Miller's estimate that the total expense of correcting the framing issues would include the cost to demolish and rebuild "all roof

---

[19] *Id*. at 5.

[20] *Id*. at 6 n.1 (first, third, and fourth alterations in original) (citation omitted).

[21] *Id*. at 5.

[22] *Id*. at 6

[23] *Id*.

trusses, second story walls and floor trusses, main floor walls, all exterior finishes, windows and doors, and all HVAC/electrical/plumbing."[24]

Second, the Arbitrator found that the exterior deck was "unquestionably substandard" and that the Redmans were entitled to recover repair costs.[25]

Third, he found that:

> The elevation of the grade on the southwest side of the foundation is too high, causing or contributing to water infiltration into the basement.  When Mr. Dohner established the elevation of the foundation, Mitzner Bobcat & Trenching told him the foundation needed to be raised by about 18" to avoid negative drainage issues. Instead of doing that, Mr. Dohner said that as a worst-case scenario he would put up retaining walls (which was only partially completed) and lower the driveway, but Mitzner warned him that would be expensive. . . .  [T]he lack of guttering is a contributing factor, but it is not the only issue.  The addition of a swale and/or mechanical drainage are practical workarounds, but this is a new home and the Redmans are entitled to have the grading corrected.[26]

Per Mr. Redman, water entering the main floor and basement of the home on multiple occasions has damaged the Redmans' personal property, caused a "damp and mildewy" smell, and resulted in some of the framing becoming soft.[27]

Fourth, the Arbitrator determined that the Redmans should recover costs incurred for a dumpster and debris removal following Heartland's abandonment of the project.  Finally, the Arbitrator found that the Redmans were entitled to recover additional rent and utilities because Heartland's work was "defective and, therefore, not properly completed within a reasonable time."[28]

---

[24] Doc. 42 at 212, Ex. D.

[25] Doc. 7-3 at 6.

[26] *Id.*

[27] Doc. 42 at 214, Unsworn Decl. of Jack Redman, Ex. E.

[28] Doc. 7-3 at 7.

The Arbitrator calculated and itemized the Redmans' damages for the foregoing construction defects and failures as follows:

| | |
|---|---|
| Framing Repair, etc. (Miller Estimate) | $95,000.00 |
| Elevation and Drainage (Mitzner Estimate) | $57,959.38 |
| Deck Repair (Miller Estimate) | $9,500.00 |
| Debris Removal | $3,400.00 |
| Dumpster Rental | $300.00 |
| Additional Rent | $4,740.00 |
| Additional Utilities | $2,591.31 |
| **TOTAL** | **$173,490.69**[29] |

### 3.      KCPA Claim for Deceptive Acts or Practices

The Arbitrator found that Heartland committed two violations of the KCPA.  First, the Arbitrator determined that Heartland charged the Redmans a markup of 73% for overhead and profit—a total of $145,918.80—in contrast to the 8-10% markup typically charged by other construction companies in the Hutchinson market.  Thus, the Arbitrator stated that Heartland "clearly overcharged the Redmans and did not build the shell at a 'reduced rate,'" as promised.[30] The Arbitrator also found that Heartland attempted to charge the Redmans twice for sales tax on materials, and then also mark that amount up with 10% profit.  These findings led the Arbitrator

---

[29] *Id.* at 7.  The Redmans brought both negligent construction claims and negligent misrepresentation and fraud claims, alleging that Heartland misled them regarding its qualifications and experience.  The Arbitrator found that the Redmans' damages for negligent misrepresentation and fraud were the same as their $173,490.46 damages for negligence resulting in construction defects.  *Id.* at 8.

[30] *Id.*

to conclude that "Heartland's billing on this project constitutes a deceptive act under the KCPA," for which he assessed a $10,000 penalty.[31]

Second, the Arbitrator found that Heartland violated the KCPA by misrepresenting the quality of its framing subcontractor, Paul Roberts.  The Interim Award explains that Dohner, the project supervisor and Heartland's only employee, contacted Roberts about the framing job because they had previously worked together.  However, "Roberts had been out of the framing business since 2008 and worked at Walmart until 2017.  In June 2017, Roberts agreed to frame the Redmans' residence, formed PDR Construction, LLC and hired a few helpers (some literally off the street) and paid most of them about $10 per hour."[32]  The Arbitrator found that "[w]ithout question, there were significant issues with the framed work," and assessed another $10,000 penalty for Heartland's misrepresentation.[33]  Finally, the Arbitrator awarded the Redmans their attorneys' fees and costs under the KCPCA.

### C.    Final Arbitration Award and Final Judgment

On September 23, 2019, the Arbitrator issued a Final Award, incorporating the Interim Award and ordering Heartland to pay the Redmans:

- $103,964.69 for breach of the Construction Agreement (overcharging) (per the Interim Award);

- $173,490.69 for negligence and negligent misrepresentation (construction deficiencies) (per the Interim Award);

- $20,000 for violations of the KCPA (per the Interim Award);

- $188,846.00 for Attorneys' fees; and

---

[31] *Id.* at 9.

[32] *Id.*

[33] *Id.*

- $16,099.16 for Expenses[34]

The Arbitrator also ordered Heartland to pay the Redmans $4,787.50 for reimbursement of 50% of the Arbitrator's compensation and expenses, for a total award of $507,188.04.

On October 16, 2019, the court in the Redman Lawsuit entered an agreed order confirming and entering judgment ("Final Judgment") on the Final Award "in the amount of $507,188.04 plus post-judgment interest at the statutory rate, which will accrue on the judgment until the judgment is paid in full."[35]

### D.     The Present Lawsuit

Nautilus filed this declaratory judgment action on September 19, 2019, seeking a determination that the Policies do not afford coverage to Heartland for the Arbitrator's Final Award and the Final Judgment.  On November 25, 2019, Nautilus filed a First Amended Complaint, and Heartland filed its Answer and Counterclaim on February 3, 2020.  Heartland's Counterclaim alleges that Nautilus's refusal to indemnify Heartland for the Final Award and Final Judgment constitutes a breach of the Policies.  Count I of Heartland's Counterclaim is titled "'Property Damage' and 'Occurrence' Under the Policies Require Indemnification."[36]  Count II is titled "The Exception to the 'Business Risk' Exclusion Under the Policies Require[s] Indemnification."[37]  Both counts assert that the policies provide coverage for the claims asserted in the Redman Lawsuit and the Arbitration Demand because they allege damages that arise out of work negligently performed by Heartland's subcontractors.[38]

---

[34] Doc. 7-4 at 4.

[35] Doc. 7-5 at 4.

[36] Doc. 15 at 35.

[37] *Id.* at 36.

[38] *Id.* at 36−37.

III.    **Discussion**

A.      **Kansas Contract Law**

"A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits."[39]  "In Kansas, the construction of a contract is governed by the law of the state in which the contract was made."[40]  "A contract is made where the last act necessary for its formation occurs."[41]  There is no dispute here that the contracts at issue were made in Kansas and are to be interpreted under Kansas law.

Kansas law provides that the interpretation and legal effect of an insurance contract is a matter of law to be determined by the court.[42]  "In construing an insurance policy, a court should consider the instrument as a whole and endeavor to ascertain the intention of the parties from the language used, taking into account the situation of the parties, the nature of the subject matter, and the purpose to be accomplished."[43]  Kansas law requires the court to "consider the relevant provisions of an insurance policy together, rather than in isolation, and give them effect."[44]  And it is well established that "judicial interpretation should not render any [contract] term meaningless."[45]  Regarding endorsements to an insurance policy, "the endorsement and the

---

[39] *Phila. Indem. Ins. Co. v. Kan. City Home Care, Inc*., 139 F. Supp. 2d 1194, 1197 (D. Kan. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941)).

[40] *Id*. (citing *Simms v. Metro. Life Ins. Co.,* 685 P.2d 321, 324 (Kan. Ct. App. 1984)).

[41] *Found. Prop. Invs., LLC v. CTP, LLC*, 159 P.3d 1042, 1046 (Kan. Ct. App. 2007) (citation omitted).

[42] *Am. Media, Inc. v. Home Indem. Co.*, 658 P.2d 1015, 1018 (Kan. 1983) (quoting *Goforth v. Franklin Life Ins. Co.*, 449 P.2d 477, 481 (Kan. 1969)); *see also Gerdes v. Am. Family Mut. Ins. Co.*, 713 F. Supp. 2d 1290, 1295 (D. Kan. 2010).

[43] *Iron Horse Auto, Inc. v. Lititz Mut. Ins. Co*., 156 P.3d 1221, 1225−26 (Kan. 2007) (citing *O'Bryan v. Columbia Ins. Grp.*, 56 P.3d 789, 792 (Kan. 2002)); *see also Magnus, Inc. v. Diamond State Ins. Co.*, 101 F. Supp. 3d 1046, 1054 (D. Kan. 2015) (citing *Brumley v. Lee*, 963 P.2d 1224, 1226 (Kan. 1998)).

[44] *U.S. Specialty Ins. Co. Inc. v. Steele*, 458 F. Supp. 3d 1310, 1315 (D. Kan. 2020) (first citing *Brumley*, 963 P.2d at 1226; and then citing *Hernandez v. Elec. Ins. Co*., No. 15-1170-JTM, 2015 WL 7274038, at *4 (D. Kan. Nov. 17, 2015), *aff'd*, 659 F. App'x 500 (10th Cir. 2016)).

[45] *LDF Food Grp., Inc. v. Liberty Mut. Fire Ins. Co*., 146 P.3d 1088, 1095 (Kan. Ct. App. 2006) (first citing *Marshall v. Kan. Med. Mut. Ins. Co*., 73 P.3d 120, 130 (Kan. 2003); then citing *Farm Bureau Mut. Ins. Co. v. Horinek*, 660 P.2d 1374, 1378 (Kan. 1983)).

policy must be read together.  The policy remains in full force and effect except as altered by the words of the endorsement.  Conversely, the endorsement modifies, to the extent of the endorsement, the terms and conditions of the original insurance contract."[46]

An insurer has a "duty to define limitations to an insured's coverage in clear and explicit terms.  To restrict or limit coverage, an insurer must use clear and unambiguous language."[47]  If the policy language is clear and unambiguous, the court must interpret it in its "plain, ordinary, and popular sense," and "enforce the contract as made."[48]  A policy is ambiguous "when it contains language of doubtful or conflicting meaning based on a reasonable construction of the policy's language."[49]  An insurance policy is not ambiguous merely because the parties disagree as to its interpretation.[50]  Rather, ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it genuinely uncertain which one of two or more meanings is the proper meaning."[51]  Whether policy language is ambiguous is a question of law, and the proper test is "not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean."[52]  If the policy language is ambiguous, then it must be liberally construed in favor of the insured.[53]

---

[46] *Ashton v. Nat'l Farmers Unions Prop. & Cas. Co.*, No. 11-4002-SAC, 2012 WL 2814129, at *7 (D. Kan. July 10, 2012) (quoting *Thornburg v. Schweitzer*, 240 P.3d 969, 976 (Kan. Ct. App. 2010)).

[47] *Kemper Ins. Cos. v. Weber*, 168 P.3d 607, 611 (Kan. Ct. App. 2007).

[48] *O'Bryan*, 56 P.3d at 792 (first citing *First Fin. Ins. Co. v. Bugg*, 962 P.2d 515, 519 (Kan. 1998); and then citing *Patrons Mut. Ins. Ass'n v. Harmon*, 732 P.2d 741, 746 (Kan. 1987)); *see also Magnus*, 101 F. Supp. 3d at 1054.

[49] *Kemper Ins. Cos.*, 168 P.3d at 610 (first citing *Marshall*, 73 P.3d 120, 130; and then citing *Jones v. Reliable Sec., Inc.*, 28 P.3d 1051, 1059 (Kan. 2011)).

[50] *Id*. at 611 (citations omitted).

[51] *Am. Family Mut. Ins. Co. v. Wilkins*, 179 P.3d 1104, 1109–10 (Kan. 2008) (quoting *O'Bryan*, 56 P.3d at 793).

[52] *Id.* at 1110 (citation omitted).

[53] *Magnus*, 101 F. Supp. 3d at 1054 (citing *Brumley v. Lee*, 963 P.2d 1224, 1226 (Kan. 1998)); *O'Bryan*, 56 P.3d at 793 (first citing *Catholic Diocese of Dodge City v. Raymer*, 840 P.2d 456, 459 (Kan. 1992), *aff'd* 840 P.2d 456 (Kan. 1992); and then citing *Patrons*, 732 P.2d at 746).

"The insured has the burden to prove coverage under the policy.  The insurance company has the duty to show that a specific provision of the policy excludes coverage." [54]

Finally, because Nautilus defended Heartland in the underlying proceedings, the sole issue before this Court is whether Nautilus has a duty to indemnify Heartland for the Final Award and Final Judgment.  Under Kansas law, "the duty to indemnify is narrower than the duty to defend."[55]  Where liability issues have been tried or settled, an insurer's duty to indemnify its insured "is determined by the facts as they are established at trial or as they are finally determined by some other means."[56]  Thus, coverage issues in this case must be determined by the facts as established in the parties' arbitration proceeding.

## B.    The Parties' Positions

Nautilus argues that certain damages awarded to the Redmans are not covered by the Policies and/or that the Policies' various exclusions and limitations preclude coverage. Specifically, Nautilus seeks partial summary judgment in its favor on Counts I, II, III, V, and VI of its Amended Complaint on the basis that: (1) there has been no "property damage" within the meaning of the Policies (Count I); (2) there has been no "occurrence" within the meaning of the Policies (Count II); (3) one or more of the Policies' "business risk" exclusions bar coverage (Count III); (4) the "expected injury" exclusion bars coverage (Count V); and (5) the limitation of coverage endorsement bars coverage (Count VI).  Nautilus does not seek summary judgment

---

[54] *Cincinnati Ins. Co. v. Gage Ctr. Dental Grp., P.A.*, No. 12-2387-KHV, 2013 WL 5913751, at *9 (D. Kan. Nov. 1, 2013) (citing *Shelter Mut. Ins. Co. v. Williams,* 804 P.2d 1374, 1383 (Kan. 1991)).

[55] *Bankwest v. Fid. Deposit Co. of Md.*, 63 F.3d 974, 978 (10th Cir, 1995) (citing *Am. Motorists Ins. Co. v. Gen. Host Corp.*, 946 F.2d 1482, 1488−89 (10th Cir.), *reh'g granted and opinion modified*, 946 F.2d 1489 (10th Cir. 1991)).

[56] *Id*. (citation omitted); *see also Atchison, Topeka & Santa Fe Ry. Co. v. Stonewall Ins. Co*., 71 P.3d 1097, 1126 (Kan. 2003) (quoting *United Wats, Inc. v. Cincinnati Ins. Co*., 971 F. Supp. 1375, 1385 (D. Kan. 1997)).

on Count IV of its Amended Complaint (alleging that the "professional services" exclusion bars coverage) or Count VII (alleging that the availability of "other insurance" precludes coverage).

Nautilus argues that Heartland has no indemnity coverage for the following damages awarded to the Redmans: (1) $103,964.69 for breach of the Construction Agreement; (2) $20,000 for violations of the KCPA; (3) $188,846 in attorneys' fees; (4) $16,099.16 for expenses; (5) $95,000 to replace the structure's framing; (6) $57,959.38 to re-grade the property; and (7) $9,500 to repair the deck.  Nautilus also seeks summary judgment in its favor on Heartland's Counterclaim for breach of the Policies.  Although Nautilus argues that Heartland lacks indemnity coverage for the bulk of the damages awarded to the Redmans, Nautilus stipulates that it will indemnify Heartland for certain damages set forth in the Final Award, including: (1) $300 for dumpster rental; (2) $3,400 for debris removal; (3) $4,740 in additional rent; and (4) $2,591.31 in additional utilities.

The Redmans and Heartland oppose Nautilus's motion for partial summary judgment; the Redmans filed a substantive response brief, while Heartland filed an "objection" to Nautilus's motion in which it entirely adopts the Redmans' response by reference.[57]  In its analysis, the Court will therefore sometimes refer to the Redmans and Heartland collectively as "Defendants."

Defendants do not contest that the Policies provide no indemnity coverage to Heartland for breach of the Construction Agreement ($103,964.69), violations of the KCPA ($20,000), and attorneys' fees ($188,846) and expenses ($16,099.16) awarded pursuant to the KCPA.  The foregoing amounts equal $328,909.85  And as set forth above, Nautilus stipulates that it will indemnify Heartland for certain portions of the negligence damages amounting to $11,031.31.  Thus, the remaining amount of the negligence damages, and what remains in dispute in this case,

---

[57] Doc. 43.

is $162,459.38, consisting of $95,000 to replace the framing, $57,959.38 to re-grade the property, and $9,500 to repair the deck.[58]

Having set forth what damages remain contested, a few matters require clarification to frame the scope of the Court's discussion.  First, Nautilus asserts in Count I of its Amended Complaint that Heartland lacks coverage because there has been no "property damage" within the meaning of the Policies, and in Count II that there has been no "occurrence" within the meaning of the Policies.  Nautilus also asserts in Count V that the "expected injury" exclusion bars coverage.  However, the foregoing arguments only apply with respect to damages for Heartland's breach of the Construction Agreement, violation of the KCPA, and attorneys' fees and costs awarded pursuant to the KCPA.  Since these categories of damages are no longer contested, Nautilus's motion for summary judgment is moot as to Counts I, II, and V.  The Court therefore proceeds to examine only whether Nautilus has met its burden to show that specific provisions of the Policies exclude coverage of the remaining negligence damages as alleged in Counts III and VI.[59]

Second, Defendants assert, without citation to authority, that because Nautilus argues that the Policies' "business risk" exclusions preclude coverage for all of the negligence damages—yet in Defendants' view, the facts show that the exclusions either apply not at all or only to a portion of those damages—"Nautilus leaves the court no middle ground.  It is either all or nothing."[60]  On this basis, Defendants argue that the "Deck Damages live to fight another day,"[61]

---

[58] The total uncontested amount of the $507,188.04 Final Award is $339,941.16, leaving $167,246.88 remaining.  But the amount that Defendants argue remains in dispute is $162,459.38, which leaves the amount the Arbitrator ordered Heartland to pay the Redmans as reimbursement for half of the Arbitrator's compensation and expenses—$4,787.50—unaccounted for.  As the parties do not dispute this amount, the Court does not address it.

[59] Because the parties do not dispute coverage of the negligence damages before consideration of any applicable exclusions, the Court expresses no opinion on whether these damages amount to an "occurrence" or "property damage" under the Policies.

[60] Doc. 42 at 7.

despite their concession that they "agree with Nautilus and the Arbitrator [that] . . the deck constructed by Heartland's subcontractor was unquestionably inadequate.  And frankly, it is hard to imagine what portions of the deck were not defectively constructed and so not excluded from coverage under Exclusion j(5)."[62]

The Court is not persuaded by Defendants' argument that because Nautilus contends that the Policies' "business risk" exclusions preclude coverage for *all* of the negligence damages, the Court cannot determine that coverage is precluded for *any portion* of those damages.  Rule 56 expressly authorizes the Court to "grant less than all of the relief requested by [a] motion."[63] Specifically, Rule 56(g) provides that "[i]f the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case."  "A partial summary judgment under Rule 56(g) is not a final judgment but rather an interlocutory summary adjudication or a pre-trial order . . . ."[64]  "The purpose of [the rule] is twofold: to salvage some of the judicial effort involved in the denial of a motion for summary judgment and to streamline the litigation process by narrowing the triable issues."[65]

---

[61] *Id*. at 17.

[62] *Id*. at 16.

[63] *Epona LLC v. Cnty. of Ventura*, No. 16-6372 DMG (PLAx), 2019 WL 7940582, at *2 (C.D. Cal. Dec. 12, 2019) (citing Fed. R. Civ. P. 56(a), (g)).

[64] *Nat'l Union Fire Ins. Co. of Pittsburgh v. Ready Pac Foods, Inc*., 782 F. Supp. 2d 1047, 1051 (C.D. Cal. 2011) (first citing *Wynn v. Reconstr. Fin. Corp*., 212 F.2d 953, 956 (9th Cir. 1954); and then citing Fed. R. Civ. P. 54(g)).

[65] *D'Iorio v. Winebow, Inc*., 68 F. Supp. 3d 334, 356 (E.D.N.Y. 2014) (quoting *In re Bak*, No. 10-23045(ASD), 2013 WL 653073, at *3 (Bankr. D. Conn. Feb. 20, 2013)); *see also Strong as Tr. of Consol. Legacy Debtors Liquidating Tr. v. Cochan*, No. 2:14-00788-TC-EJF, 2019 WL 7290835, at *3 (D. Utah Dec. 30, 2019) ("Rule 56(g) is ancillary to the ultimate summary-judgment analysis, operating to salvage some results from the time and resources spent in deciding unsuccessful summary-judgment motions.") (quoting *Kreg Therapeutics, Inc. v. Vitalgo*, 919 F.3d 405, 415 (7th Cir. 2019))).

Under the circumstances of this insurance coverage declaratory judgment action, a finding that a portion of the negligence damages is excluded would simplify this litigation by leaving only the amount of the covered damages to be determined at trial.  Because Defendants have conceded that the deck damages of $9,500 are excluded from coverage under Exclusion j(5), the Court analyzes only the remaining framing and grading damages below.

**C.     Framing Damages**

Nautilus argues that the framing damages awarded by the Arbitrator are excluded from coverage by multiple of the Policies' "business risk" exclusions.  The Court discusses each exclusion below.

**1.     Exclusions j(5) and j(6)**

Under Exclusions j(5) and j(6), the Policies provide that coverage is excluded for:

> "Property damage" to:
>
> …
>
> > (5)     That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations.
> >
> > (6)     That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.
>
> …
>
> Paragraph (6) of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".[66]

The Policies state that the "products-completed operations hazard":

---

[66] Doc. 7-6 at 21−22; Doc. 7-7 at 21-22.

Includes all "bodily injury" or "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

(1)     Products that are still in your physical possession; or

(2)     Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

    (a)     When all of the work called for in your contract has been completed.

    (b)     When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

    (c)     When that part of the work done at a job site has been put to its intended use by any person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.[67]

Thus, under Exclusion j(5), coverage will be excluded for property damage *to "[t]hat particular part . . . on which* [Heartland or another on its behalf] *. . .* [was] performing operations, if the 'property damage' arises out of those operations."[68]  Under Exclusion j(6), coverage will be excluded for property damage *to "[t]hat particular part* of any property that must be restored, repaired or replaced because '[the work of Heartland or another on its behalf]'

---

[67] Doc. 7-6 at 31; Doc. 7-7 at 32.

[68] *MTI, Inc. v. Emps. Ins. Co. of Wausau*, 913 F.3d 1245, 1249 (10th Cir. 2019) (first, second, and fourth alterations in original) (emphasis added).

was incorrectly performed on it."[69]  Both sections exclude coverage for property damage to the particular part on which the insured was working while that work was ongoing.[70]

The parties do not dispute that Heartland's subcontractor's construction of the framing consists of "your work" resulting in "property damage," or that the framing work was ongoing when damage occurred.  The parties nonetheless disagree on whether Exclusions j(5) and (6) bar coverage for some or all of the framing damages awarded to the Redmans in arbitration. Nautilus's position is that Exclusion j(5) and j(6) bar all damages awarded to replace the framing.  Defendants argue that the use of the phrase "that particular part" renders both exclusions ambiguous and that they must therefore be construed in Heartland's favor, meaning that only the cost of replacing the TJI rafters is excluded, not the remainder of the framing damages.

"The purpose of a commercial general liability policy is to protect the insured from liability for damages when his own defective work or product damages someone else's property."[71]  "Damage to an insured's own work resulting from his faulty workmanship on it is usually covered by a performance bond, not a commercial general liability policy."[72]  However, the Tenth Circuit has cautioned that "even if [a] CGL policy does share some characteristics of a performance bond, that alone is an insufficient reason to ignore the plain language and intent of the policy."[73]

---

[69] *Id*. (first alteration in original) (emphasis added).

[70] *See Advantage Homebuilding, LLC v. Md. Cas. Co*., 470 F.3d 1003, 1011−12 (10th Cir. 2006); *MTI, Inc*., 913 F.3d at 1252.

[71] *Farmington Cas. Co. v. Duggan*, 417 F.3d 1141, 1142 (10th Cir. 2005) (citing *Hartford Acc. & Indem. Co. v. Pacific Mut. Life Ins. Co.,* 861 F.2d 250, 253 (10th Cir.1988)); *see also Expl. Place, Inc. v. Midwest Drywall Co*., 89 P.3d 536, 543–44 (Kan. 2004).

[72] *Farmington*, 417 F.3d at 1142 (citations omitted).

[73] *Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co*., 661 F.3d 1272, 1288−89 (10th Cir. 2011).

The Kansas Supreme Court has not spoken on the question of whether Exclusions j(5) and (6), or similarly worded exclusions, are ambiguous.  The Kansas Court of Appeals and several federal district court cases either find no ambiguity in these exclusions or do not directly address the question of ambiguity.[74]  However, the Tenth Circuit recently held, in a case involving Oklahoma law, that the phrase "that particular part" is ambiguous as used in these exclusions, that it is "narrowing language," and that the exclusions prelude coverage only for "the distinct components upon which work is performed."[75]  The Court examines below the decisions cited by the parties or otherwise informing the Court's analysis of the phrase, "that particular part."

In 1993, Judge Lungstrum found in *Johnson v. Studyvin* that an exclusion worded similarly to Exclusion j(5) precluded coverage for a couple's claims against a contractor.[76]  In that case, the insured contractor applied asbestos-containing materials ("ACM") to the ceiling of the couple's home; when the roof was damaged five years later and the ceiling had to be replaced, asbestos was released into the air and contaminated the entire house.[77]  The exclusion at issue provided that the insurance policy did not apply "to property damage . . . to . . . that particular part of any property, not on premises owned by or rented to the insured, . . . upon which operations are being performed by or on behalf of the insured at the time of the property damage arising out of such operations . . . ."[78]

---

[74] *Util. Maint. Contractors, Inc. v. W. Am. Ins. Co.*, 866 P.2d 1093, 1095−97 (Kan. Ct. App. 1994); *Am. Mercury Ins. Grp. v. Urban,* No. 00-2122-DJW, 2001 WL 1723734, at *7−10 (D. Kan. May 23, 2001); *Johnson v. Studyvin,* 839 F. Supp. 1490, 1498−99 (D. Kan. 1993).

[75] *MTI, Inc.*, 913 F.3d at 1249−50; *see also Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 882 F.3d 952, 960 (10th Cir. 2018).

[76] 839 F. Supp. at 1498−99.

[77] *Id*. at 1492.

[78] *Id*. at 1495.

Without separately discussing the phrase "that particular part," Judge Lungstrum found that the exclusion

> on its face exclude[d] coverage for the type of property damage suffered . . . .  By applying the ACM to the ceiling of the . . . home, [the contractor] damaged property, upon which operations were being performed by him, at the time of such operations.  Contrary to plaintiff's position, the exclusion does not state that it applies only to property damage to the work product of the [contractor]. . . .  The court finds that [the] exclusion is not ambiguous, and that plaintiffs are bound by the clear language of the policy."[79]

The following year, the Kansas Court of Appeals considered in *Utility Maintenance Contractors, Inc. v. West American Insurance Co*. whether Exclusion j(5) precluded coverage for damage to a sewer line when a contractor was hired to unclog tree root blockage at one spot along the line, but damaged 160 feet of the line in the process, including 115 feet from the access manhole to the clog site and 45 feet beyond the clog site.[80]  Like Judge Lungstrum in *Johnson*, the court found that "[t]he general rule that exclusionary provisions should be strictly construed in favor of the insured is not applicable in this case . . . . [because] [a] natural and reasonable interpretation of [the exclusion] reveals no ambiguity."[81]

Having found no ambiguity, the Court interpreted the phrase "that particular part" to include more than just the clog site, because it was necessary for the contractor to maneuver the root cutter through the line to reach the clog, and therefore held that the exclusion precluded coverage for damage to 115 feet of the sewer line between the manhole where the contractor accessed it and the clog site.[82]  The court stated that because of the necessity of accessing the

---

[79] *Id.* at 1498−99.

[80] 866 P.2d 1093, 1095−97 (Kan. Ct. App. 1994).

[81] *Id.* at 1097.

[82] *Id.*

clog through the sewer, "the sewer pipe and the clog point should be viewed as a whole."[83]  As

to the remaining 45 feet of damaged sewer line beyond the clog site, the court found that

coverage would be determined based on a "factual showing on remand [as to whether] it was the

usual and necessary practice under similar circumstances to use the cutter beyond the initial point

in the line where the clog is first noted."[84]

Seven years after the Kansas Court of Appeals decided *Utility Maintenance*, Judge

Waxse cited that case in support of his interpretation of Exclusions j(5) and (6) in *American*

*Mercury Insurance Group v. Urban*.[85]  The facts in *American Mercury* were that Urban hired

Meadows to design, construct, and/or install various elements to an existing grain-handling

facility.[86]  Specifically, Meadows was to develop the concrete work needed to integrate a grain

dryer, wet bin, two overhead bins, a grain pit, a grain leg, and related parts into the facility.[87]

Meadows poured the concrete pad on which the wet bin sat, completed the roof, and began

constructing the wet bin, but died before he was able to complete the job; a different contractor

completed the work.[88]   After the wet bin was filled, the concrete pad constructed by Meadows

settled, causing the wet bin to tilt and resulting in damage to the bin and other portions of

Urban's grain-handling facility that were not constructed by Meadows.[89]

Urban sued Meadows's estate, and the insurer denied coverage on the basis of Exclusions

j(5) and (6), among others.  Urban argued that the damages alleged were to his entire facility

---

[83] *Id.*

[84] *Id.*  Regarding Exclusion j(6), the court found that there had been no determination in the trial court that the insured had performed its work "incorrectly," and that this issue was a factual determination to be decided on remand.  *Id.* at 1098−99.

[85] No. 00-2122-DJW, 2001 WL 1723734 (D. Kan. May 23, 2001).

[86] *Id.* at *1.

[87] *Id.*

[88] *Id.*

[89] *Id.* at *2.

rather than to the particular part of the property on which Meadows worked, and that Exclusions j(5)and (6) therefore did not apply.[90]  On the facts of the case, the court disagreed with Urban's interpretation, finding that "Kansas law supports a finding that under the terms of the contract[,] that 'particular part' of the real property upon which [Meadows] performed work actually encompasses the 'grain-handling facility' as a whole."[91]  Judge Waxse based this finding on "facts establish[ing] that the parties intended [Meadows] to work, and [Meadows] did in fact work, on the entire 'grain-handling facility.'"[92]

However, Judge Waxse ultimately found that Exclusion j(5) did not preclude coverage because it "is written in the present tense" and applies only where property damage occurs while the insured is "in the process of performing operations," which Meadows was not at the time the concrete pad settled.[93]  Similarly, the court held that Exclusion j(6) did not preclude coverage because that exclusion is inapplicable to property damage falling within the products-completed operations hazard.[94]  Thus, as Defendants point out, Judge Waxse's analysis of the phrase "that particular part" was unnecessary to his conclusion and is dicta.

While the Kansas Court of Appeals and two judges of this federal district have broadly interpreted or found no ambiguity in Exclusions j(5) and/or (6) (or a similarly worded exclusion), the Tenth Circuit reached the opposition conclusion in a 2019 case involving Oklahoma law.  In *MTI, Inc. v. Employers Insurance Co. of Wausau*, the plaintiff insured, MTI, was hired to repair

---

[90] *Id*. at *7, 9.

[91] *Id*. at *8 (first citing *Util. Maint. Contractors, Inc. v. W. Am. Ins. Co*., 866 P.2d 1093, 1097 (Kan. Ct. App. 1994); and then citing *William Crawford, Inc. v. Travelers Ins. Co*., 838 F. Supp. 157, 159 (S.D.N.Y. 1993), *aff'd*, 23 F.3d 663 (2d Cir. 1994)).

[92] *Id*.

[93] *Id*.

[94] *Id*. at *10.

cooling towers owned by Western Farmers Electrical Cooperative ("WFEC").[95]  MTI removed all of the anchor bolts from Tower 1, but did not immediately replace them with new bolts or provide another means of temporary support for the tower.[96]  The following day, high winds caused the tower to lean and several of its components broke as a result.[97]  The tower was damaged to such an extent that it had to be completely removed and replaced, and WFEC demanded that MTI pay over $1.4 million for the cost of that work.[98]  After MTI's insurer declined coverage, MTI negotiated a settlement with WFEC and then sought recoupment of its settlement payment under the insurance policy.[99]

On appeal from the district court's finding that all of the property damage fell within the scope of both Exclusion j(5) and (6), the Tenth Circuit first examined whether the exclusions were rendered ambiguous by the use of the phrase, "that particular part"—a question that the Oklahoma Supreme Court had not previously addressed.[100]  After examining decisions of other courts going both ways, the Tenth Circuit ultimately answered that question in the affirmative:

> The phrase "that particular part" could be read to refer solely to the direct object on which the insured was operating.  Alternatively, it could apply to those parts of the project directly impacted by the insured party's work.  We agree with those courts that have held the former interpretation is a reasonable one, although we acknowledge that the latter is also reasonable.  Because both readings are permissible, the exclusions are facially ambiguous.[101]

Having found the exclusions ambiguous, the Court construed them narrowly in MTI's favor, looking to "the objectively reasonable expectations of the insured to fashion a remedy" as

---

[95] 913 F.3d 1245, 1247−48 (10th Cir. 2019).

[96] *Id*. at 1248.

[97] *Id*.

[98] *Id*.

[99] *Id*.

[100] *Id*. at 1248−49.

[101] *Id*. at 1250 (citing *Cranfill v. Aetna Life Ins. Co*., 49 P.3d 703, 706 (Okla. 2002)).

required by Oklahoma law.[102]  On the facts of the case, the court found that "interpreting 'that particular part' to refer to the distinct components upon which work is performed best comports with these rules of interpretation," meaning that coverage was only excluded for the anchor bolts themselves.[103]

However, the Tenth Circuit took care to note that "[e]ven under this definition, determining the 'particular part' on which an insured works 'will vary with the facts and circumstances of each particular case.'"[104]  Critically here, the court noted that "[i]n some instances, a larger unit will properly be considered the particular part," and that "an entire structure may qualify."[105]  The Tenth Circuit remarked that other courts "have held that the exclusions so apply when an insured was hired to raise the entire structure."[106]

The *Johnson* and *American Mercury* decisions are not binding on this Court.  Other than *Utility Maintenance*, decided nearly thirty years ago, the parties do not cite, and this Court has not found, any other opinion from the Kansas appellate courts discussing whether Exclusions j(5) and (6) are ambiguous.  "[I]n the absence of any 'persuasive data' demonstrating that the Kansas Supreme Court would decide the . . . issue contrary" to *Utility Maintenance*, the Court of

---

[102] *Id.* (quoting *Hawforth v. Jantzen*, 172 P.2d 193, 197 (Okla. 2006)).

[103] *Id.*; *see also, e.g., Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 882 F.3d 952, 960 (10th Cir. 2018); *Fortney & Weygandt, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 595 F.3d 308, 311 (6th Cir. 2010) ("The opening words of the exclusion—namely, '[t]hat particular part'—are trebly restrictive, straining to the point of awkwardness to make clear that the exclusion applies only to building parts on which defective work was performed, and not to the building generally.") (alteration in original)); *Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 215 (5th Cir. 2009) ("The narrowing 'that particular part' language is used to distinguish the damaged property that was itself the subject of the defective work from other damaged property that was either the subject of nondefective work by the insured or that was not worked on by the insured at all."). *But see Archer W. Contractors, Ltd. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 680 F. App'x 604, 606 (9th Cir. 2017) (stating that "California courts have construed 'that particular part' to encompass the entire project on which a general contractor is performing operations") (collecting cases)).

[104] *MTI, Inc.*, 913 F.3d at 1250−51 (quoting *Vinsant Elec. Contractors v. Aetna Cas. & Sur. Co.*, 530 S.W.2d 76, 77 (Tenn. 1975)).

[105] *Id.* at 1251 (citing *Jet Line Servs., Inc. v. Am. Emps. Ins. Co.*, 537 N.E.2d 107, 111 (Mass. 1989)).

[106] *Id.* (first citing *Lafayette Ins. Co. v. Peerboom*, 813 F. Supp. 2d 823, 834 (S.D. Miss. 2011); and then citing *Grinnell Mut. Reinsurance Co. v. Lynne*, 686 N.W.2d 118, 125 (N.D. 2004)).

Appeals' published decision is "authoritative."[107]  However, *Utility Maintenance* involved much simpler and arguably distinguishable facts when compared with this matter.

The Court ultimately need not resolve in this case whether Exclusions j(5) and (6) are ambiguous under Kansas law due to the use of the phrase "that particular part," because even assuming that they are and must be construed narrowly to comport with the reasonable expectations of the insured, the Court would still find—following the Kansas Court of Appeals' reasoning in *Utility Maintenance*—that the distinct "particular part" here would include any portion of the framing that Heartland was working on in the process of installing the rafters as part of "the usual and necessary practice under similar circumstances."[108]  This interpretation conforms with the Tenth Circuit's recent observation that:

> the policy excludes damages to "that particular part" of the project upon which the insured's operations were being performed at the time the damage occurred, but it covers damage to property other than "that particular part."  This is the current understanding of the phrase "that particular part" in the insurance industry today.[109]

Heartland was hired to construct the entire Redman residence.  While working on the framing component, Heartland improperly notched the TJI rafters at the home's bearing walls, which the Arbitrator found created a structural defect and the need to tear down and replace the entire framing.  Given these facts, certain elements of the home may properly be included within the distinct, "particular part" of the project on which Heartland was actively working at the time of the property damage—certainly including, but not necessarily limited to—the TJI joists.

However, the Court does not have an adequate record before it to accept either party's interpretation of "that particular part," or something in between, as applied to the facts of this

---

[107] *Wildermuth v. Staton*, No. 01-2418-CM, 2002 WL 922137, at *6 (D. Kan. Apr. 29, 2002) (quoting *Sports Unlimited, Inc. v. Lankford Enters., Inc.*, 275 F.3d 996, 1000, 1002 (10th Cir. 2002)).

[108] *Util. Maint. Contractors, Inc. v. W. Am. Ins. Co.*, 866 P.2d 1093, 1097 (Kan. Ct. App. 1994).

[109] *Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 882 F.3d 952, 960 (10th Cir. 2018) (citation omitted).

case.  The Arbitrator's Interim and Final Awards lack sufficient information for the Court to determine what elements of the home may be included within the "particular part" on which Heartland was working at the time of the damage.[110]  For example, the Arbitrator stated in the Interim Award that "all of the upper framing, roofing, doors and windows need to be removed, down to the level of the basement framing."[111]  However, the Arbitrator also included within the framing damages the costs of replacing the home's HVAC, electrical, and plumbing, which are nowhere mentioned in either the Interim or Final Award.  Moreover, the Arbitrator's table of damages lists the $95,000 in framing damages as "Framing Repair, *etc*."[112]  Notably, the Tenth Circuit has recognized that "stud framing" and "electrical wiring" may be separate and distinct components for the purposes of Exclusions j(5) and (6).[113]  Further, the home's windows were presumably added after the framing was finished and, although the facts are not entirely clear, appear to have been included in the damages awarded because they were not the type that the Redmans told Heartland they wanted.

The Court finds that damages for removal and replacement of the TJI rafters, whatever they may be, are excluded by Exclusions j(5) and (6)—that issue is not in dispute and is deemed established in this case pursuant to Rule 56(g).  Given the ambiguities noted above, however, there remains a dispute of material fact regarding the total scope of "that particular part" on

---

[110] *See Am. Home Assur. Co. v. Cat Tech L.L.C.*, 660 F.3d 216, 225 (5th Cir. 2011) (concluding, in case involving "your work" exclusion, that it was "impossible to discern from the Arbitrator's award . . . whether . . . support beams [were] part of the reactor internals or whether the support beams [were] separate components that were damaged by [the insured's] work on the reactor internals," and finding that "the district court erred when it relied on the award in granting the [insurer's] summary judgment motion").

[111] Doc. 7-3 at 6.

[112] *Id*. at 7 (emphasis added).

[113] *MTI, Inc.*, 913 F.3d at 1251 (quoting *Mid-Continent Cas. Co. v. JHP Dev., Inc.*, 557 F.3d 207, 217 (5th Cir. 2009)); *see also Westfield Ins. Co. v. Miller Architects & Builders*, 949 F.3d 403, 405 (8th Cir. 2020) (finding that general contractor with responsibility for constructing entire apartment complex lacked coverage for interior damage caused by leaking roof because "it is far from clear that the roof, which is on the building's *exterior*, and the finishes and electrical work, which are in the building's *interior*, are the same 'particular part of [the] property'") (alteration in original)).

which Heartland was performing operations at the time the property damage occurred, and what portion of the $95,000 in framing damages is properly attributed to "that particular part." Accordingly, Nautilus is not entitled to summary judgment in its favor under Exclusions j(5) and j(6).

### 2. "Your Product" Exclusion

The Court quickly disposes of Nautilus's argument that the framing damages are barred by Exclusion k, "Damage to Your Product." That exclusion precludes coverage for "'[p]roperty damage' to 'your product' arising out of it or any part of it."[114] The Policies define "your product," in relevant part, as follows:

> "Your product":
>
> a.   Means:
>
>      (1)   Any goods or products, *other than real property*, manufactured, sold, handled, distributed or disposed of by:
>
>            (a)   You;
>
>            (b)   Others trading under your name;
>
>                           …
>
> b.   Includes
>
>      (1)   Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and
>
>      (2)   The providing of or failure to provide warnings or instructions.[115]
>
>                           …

---

[114] Doc. 7-6 at 22; Doc. 7-7 at 22.

[115] Doc. 7-6 at 32 (emphasis added); Doc. 7-7 at 33 (emphasis added).

Defendants point out that in *Lee Builders, Inc. v. Farm Bureau Mutual Insurance Co.*, the Kansas Court of Appeals held that the "your product" exclusion does not apply when the named insured is erecting a building because the definition of "your product" expressly excludes real property.[116]  The court noted that "cases are legion that similarly construe and apply the real property exception to the 'your product' exclusion,"[117] and explained that "[t]his [specific exception of real property under the 'your product' exclusion] provides meaningful clarification that work performed by contractors on dwellings, buildings, structures, and other realty is not considered to be the named insured's product."[118]

Nautilus cites *American Mercury* in support of its argument that the "your product" exclusion does apply because the negligence damages in this case were awarded to repair or replace Heartland's defective products such as windows, doors, and nails (when screws should have been used instead).  In *American Mercury*, Judge Waxse found that this exclusion barred coverage for partial loss of use of the grain-handling facility because the facts established that the insured had "handled" the property as a whole.[119]  Nautilus contends that it is irrelevant that *American Mercury* was decided before *Lee Builders*, and did not address whether the grain-handling facility was "real property," because the same policy language was before both courts. This Court disagrees.

As set forth above, the Kansas Court of Appeals' published decisions are authoritative, whereas other district court opinions are not binding on this Court.  The Kansas Court of Appeals

---

[116] 104 P.3d 997, 1004−05 (Kan. Ct. App. 2005).

[117] *Id.* (collecting cases).

[118] *Id.* (second alteration in original) (quoting Holmes' Appleman on Insurance 2d, § 132.9, p. 151 (2002)); *see also Am. States Ins. Co. v. Powers*, 262 F. Supp. 2d 1245, 1252 (D. Kan. 2003), *abrogated on other grounds by Advantage Homebuilding, LLC v. Md. Cas. Co.*, 470 F.3d 1003, 1010−11 (10th Cir. 2006)).

[119] *Am. Mercury Ins. Grp. v. Urban*, No. 00-2122-DJW, 2001 WL 1723734, at *10 (D. Kan. May 23, 2001).

has held that the "your product" exclusion does not apply when the insured contractor is constructing real property, and Nautilus makes no argument to support that the Redman residence is not real property.  And unlike Exclusions j(5) and (6), the "your product" exclusion does not include narrowing "that particular part" language.  Exclusion k therefore does not in any way apply to the framing damages in this case.

### 3.   "Impaired Property" Exclusion

Nautilus also argues that the framing damages are precluded by Exclusion m, or the "impaired property" exclusion.  This exclusion, titled "Damage To Impaired Property Or Property Not Physically Injured," precludes coverage for:

> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1)   A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> (2)   A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.[120]
>
> …

The Policies define "impaired property" to mean:

> tangible property, other than "your product" or "your work," that cannot be used or is less useful because:
>
> a.   It concorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate, or dangerous; or
>
> b.   You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by:

---

[120] Doc. 7-6 at 22; Doc. 7-7 at 22.

      a.      The repair, replacement, adjustment or removal of "your product" or "your work"; or

      b.      Your fulfilling the terms of the contract or agreement.[121]

The Policies define "your work" as follows:

      a.      Means:

          (1)      Work or operations performed by you or on your behalf; and

          (2)      Materials, parts or equipment furnished in connection with such work or operations.

      b.      Includes

          (1)      Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work", and

          (2)      The providing of or failure to provide warnings or instructions.[122]

The definition of "your product" is set forth above in Part III.C.2.

Defendants argue that Exclusion m cannot apply to the framing because it is neither (1) "impaired property," nor (2) "property that has not been physically injured."[123]  First, Defendants assert that because the premises as a whole consists of Heartland's "work" and/or "product," no part of the home falls within the definition of "impaired property."  The Court agrees.  Although the Policies' definition of "your product" excludes real property, their definition of "your work" does not.  Thus, the Redman residence, including the framing, qualifies as Heartland's "work" and falls outside the definition of "impaired property" under Exclusion m.  As Judge Lungstrum has explained:

---

[121] Doc. 7-6 at 29−30; Doc. 7-7 at 30.

[122] Doc. 7-6 at 32; Doc. 7-7 at 33.

[123] Doc. 42 at 22−23, 26−27.

> [U]nder exclusion "m," "impaired property" means tangible property other than "your work." "Your work" is defined as "work or operations performed by you or on your behalf." Thus, the project would not constitute impaired property because it was the insured's work. Exclusion "m" applies in a situation where, for example, the insured's work is incorporated into other property and that property is not able to be used because of a defect in the insured's work. That is not the case here.[124]

Second, Defendants argue that the framing is not "property that has not been physically injured" because the entire framing requires removal and replacement due to Heartland's improper notching of the TJI joists, and such removal and replacement constitutes a physical injury within the meaning of the "impaired property" exclusion. Courts have held that "[w]hen the fixing of faulty components results in the destruction and replacement of other components, the fix itself 'necessitated injury to tangible property, and the injury was unquestionably physical.'"[125] Thus, "[t]his exclusion should not apply to eliminate coverage where the incorporation of defective work or product does no actual physical damage to tangible property but the removal or repair of that work has or will physically injure other property."[126]

Although Nautilus bears the burden to show that a specific provision of the Policies excludes coverage, and on summary judgment must show that no reasonable trier of fact could

---

[124] *Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co.*, 189 F. Supp. 2d 1212, 1225 n.8 (D. Kan. 2002); *see also Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 378 F. Supp. 3d 975, 999 (D. Kan. 2019) (noting that the "impaired property" exclusion "would have no application where the damage, including the loss of use, occurs to the construction performed by the insured or its subcontractors") (quoting Philip L. Bruner and Patrick J. O'Connor, Jr., Bruner and O'Connor on Construction Law § 11:264 (2018)).

[125] *Black & Veatch Corp.*, 378 F. Supp. 3d at 1000 (quoting *U.S. Metals, Inc. v. Liberty Mut. Grp., Inc.*, 490 S.W.3d 20, 28 (Tex. 2015)).

[126] *Id.* (citation omitted); *see also N. Star Mut. Ins. Co. v. Rose*, 27 F. Supp. 3d 1250, 1254 (E.D. Okla. 2014) ("[T]he exclusion does not apply where there is physical damage to the other property into which the insured's work or product has been incorporated *or* if the insured's work cannot be repaired or replaced without causing physical injury to the other property.") (alteration in original) (citation omitted)); *Emprs. Mut. Cas. Co. v. Grayson*, No. 07-917-C, 2008 WL 2278593, at *6−7 (W.D. Okla. May 30, 2008) (finding that Exclusion m did not exclude coverage for cost to replace rebar, concrete rails, and expansion joint damaged during removal of insured's concrete product used in bridge construction).

find for Defendants, its reply brief does not address Defendants' arguments against the application of the "impaired property" exclusion and, in fact, is totally silent regarding Exclusion m.

Exclusion m does not apply to the TJI rafters themselves, as they are neither "impaired property" (because they are Heartland's work) nor "property that has not been physically injured" (because Heartland's subcontractor damaged the rafters when it birdsmouth cut them). In fact, as to the entirety of the framing damages, Nautilus has not demonstrated that this exclusion—which commentators have criticized as "too complex to receive a uniform interpretation" and "subject to attack as 'unintelligible or at least ineffective to overcome the insured's reasonable expectations of coverage'"—has any application.[127]

Exclusion m "is meant to apply to the situation in which the insured's own work impairs *other* property."[128]  The purpose of the exclusion is to "narrow[] coverage for claims involving the reduced usefulness or impairment of property *other than the insured's*."[129]  Further, the exclusion "only excludes damage to property that has not been physically injured or for which the claimed damages are only for loss of use of that property."[130]  Here, the framing damages

---

[127] *Black & Veatch Corp.*, 378 F. Supp. 3d at 998 (citation omitted); *see also Auto-Owners Ins. Co. v. High Country Coatings, Inc.*, 261 F. Supp. 3d 1129, 1138 n.11 (D. Colo. 2017) ("I have encountered this exclusion before and found it quite difficult to construe myself.  In any event, as I have found before, I find here that [the insurer] has not met its burden under Colorado law to definitively establish the policy exclusion applies.") (citations omitted)).

[128] *Durbrow v. Mike Check Bldrs., Inc.*, 442 F. Supp.2d 676, 684 (E.D. Wis. 2006); *see also Black & Veatch Corp.*, 378 F. Supp. 3d at 999 (stating that insurer failed to show how any "non-damaged property" was "tangible property other than . . . [the insured's] 'Your Work'") (first alteration in original) (citation omitted)).

[129] *Emprs. Mut. Cas. Co.*, 2008 WL 2278593, at *6 (emphasis added).

[130] *Martco Ltd. P'ship v. Wellons, Inc.*, 588 F.3d 864, 876 (5th Cir. 2009) (quoting *Gaylord Chem. Corp. v. ProPump, Inc.*, 753 So.2d 349, 355 (La. Ct. App. 2000)); *see also, e.g., Oxford Aviation, Inc. v. Global Aerospace, Inc.*, 680 F.3d 85, 91 (1st Cir. 2012) (stating that Exclusion m "in essence preclude[s] coverage for *loss of use* claims arising from faulty work or products when there is no physical injury to the property") (citation omitted)).  *But see Auto-Owners Ins. Co.*, 261 F. Supp. 3d at 1138 n.11 (stating that "[w]hether this exclusion applies when property is alleged to have been physically damaged or whether it only applies to non-physical 'loss of use' damages appears to be up for debate," but finding in any case that insurer had failed to meet its burden to "definitively establish the policy exclusion applies") (collecting cases)).

awarded were not for the loss of use of undamaged property, but for the complete replacement of faulty framing, all of which was done by Heartland.  Given the ambiguity of the "impaired property" exclusion as applied to these facts, and particularly in light of Nautilus's failure to respond to Defendants' arguments, the Court finds that Exclusion m does not bar coverage for the framing damages.

### D.  Grading Damages

With respect to the grading damages, the Court begins with Exclusions j(5) and (6), the relevant text of which is set forth above in Part III.C.1.  Defendants argue that these exclusions do not apply to the grading damages because the "property damage" at issue is water intrusion into the basement of the premises, not the land that Heartland's subcontractors improperly graded, and because the work was completed before the property damage occurred.  Nautilus responds that the only grading damages awarded were for the faulty grading itself, not water damage, and that such damage occurred while Heartland was performing operations, not afterward.  Nautilus has the better part of the argument here.

Although Defendants assert that "the Grading Damages were not awarded to fix 'property damage' to the land that was negligently graded," that appears to be exactly what those damages were awarded for.[131]  The Interim Award states that the amount of $57,959.38 is awarded "to have the grading corrected," per the estimate of Mitzner Bobcat & Trenching, but is silent regarding any damages for water intrusion into the home.  The Court finds that the "particular part" of the real property on which Heartland's subcontractor was performing operations, and which was damaged by those operations, is the grading itself.

---

[131] Doc. 42 at 16.

Defendants also argue that because damage to the interior of the home due to poor drainage occurred after the grading work was completed, neither Exclusion j(5) nor Exclusion j(6) applies, because those exclusions only apply to property damage that occurs while work is ongoing.  Again, however, the Arbitrator awarded damages to allow the Redmans to redo the home's exterior grading, *not* for water damage to the home, and the grading work was ongoing when the damage occurred.  Exclusion j(5) and (6) bar coverage for the grading damages.

Because the Court finds that Exclusions j(5) and (6) preclude coverage for the grading damages, it does not address the application of Exclusions k and m.

### E.    Limitation Endorsement

Nautilus argues that coverage for all damages is also excluded by the Limitation of Coverage Endorsement to the 2016-2017 Policy ("2016-2017 Limitation Endorsement"), which states:

**LIMITATION OF COVERAGE**

...

**SCHEDULE**

**Operations:**
HOME BUILDERS

**Premises/Project:**
424 WEST AVE D & BLUESTEM DRIVE ADDITIONS IN
SOUTH HUTCHINSON, KS 67505

This insurance applies only to "bodily injury", "property damage", "personal and advertising injury" or medical payments arising out of:

(1)    Operations designated in the Schedule; and/or

(2)    The premises/project shown in the Schedule.

This insurance does not apply to "bodily injury", "property damage", "personal and advertising injury" or medical payments

arising out of any operations other than those designated in the
Schedule.[132]

Nautilus contends that because the 2016-2017 Limitation Endorsement does not include the

address of the premises at issue in the Arbitration and the Redman Lawsuit, the "plain language"

of the endorsement bars coverage for the Final Award and Final Judgment.[133]  The Court is not

persuaded by this argument.

The "operations" listed in the 2016-2017 Limitation Endorsement are "home builders,"

and the endorsement states that coverage applies for property damage arising out of the

operations designated in the Schedule *and/or* the premises/project listed in the Schedule.

Nautilus argues that this "and/or" language "should be read in the conjunctive" such that

coverage is limited to operations at the listed address, but points to no facts or authority to

support this interpretation.[134]  Because Heartland was operating as a "home builder" when it

constructed the Redman residence, those operations are covered and the damages at issue in the

Final Award and Final Judgment are not barred by the 2016-2017 Limitation Endorsement.

Although Nautilus did not raise the 2017-2018 Policy's Limitation of Coverage

Endorsement ("2017-2018 Limitation Endorsement") in its motion, Defendants point out that

that endorsement differs from the 2016-2017 Limitation Endorsement.  The 2017-2018

Limitation Endorsement states:

---

[132] Doc. 7-6 at 69.

[133] Doc. 36 at 29.

[134] Doc. 44 at 10.

> **Operations:**
> 424 WEST AVE D & BLUESTEM DRIVE ADDITIONS IN
> SOUTH HUTCHINSON, KS 67505
>
> **Premises/Project:**
>
>
> This insurance applies only to "bodily injury", "property damage",
> "personal and advertising injury" or medical payments arising out
> of:
>
> > (1)     Operations designated in the Schedule; and/or
>
> > (2)     The premises/project shown in the Schedule.
>
> This insurance does not apply to "bodily injury", "property
> damage", "personal and advertising injury" or medical payments
> arising out of any operations other than those designated in the
> Schedule.[135]

Defendants contend that the listing of a physical address under "Operations" instead of "Premises/Project" appears to have been a typographical error, not an intentional change to limit coverage, and that the 2017-2018 Limitation Endorsement should be read as identical to the 2016-2017 Limitation Endorsement due to ambiguity.  Seizing upon Defendants having raised the 2017-2018 Limitation Endorsement, Nautilus argues for the first time in its reply brief that the later endorsement limits coverage to operations performed at the specific address listed under "Operations."  The Court rejects this argument for several reasons.

First, the Court agrees with Defendants that the 2017-2018 Limitation Endorsement is ambiguous because it appears incomplete, and because the listing of a physical address under "operations" makes little sense when there is a separate space for "premises/project," and does, indeed, appear to be an error.  The Court therefore construes the Limitation Endorsement in favor of coverage.   Second, even if that were not the case, Nautilus failed to include either

---

[135] Doc. 7-7 at 71.

Limitation Endorsement in its statement of uncontested facts, where it expressly asserts that the language of the two Policies is "identical" except for the policy term.[136]  Third, the Court lacks supporting facts it would need to understand and apply either of these limitation endorsements to events that began in May 2017 and culminated with the Final Award and Final Judgment in September and October of 2019, respectively.  Nautilus has failed to carry its burden to demonstrate that the damages awarded are barred by either limitation endorsement, and the Court finds that they are not.

### F.    Heartland's Counterclaim

Nautilus also moves for summary judgment on Heartland's Counterclaim, which alleges that Nautilus's refusal to indemnify Heartland for the Final Award and Final Judgment constitutes a breach of the Policies.  Again, Heartland did not file its own response to Nautilus's motion for partial summary judgment, but instead incorporates the Redmans' response.  And the Redmans make no argument regarding the viability of Heartland's Counterclaim, except to ask that the Court "incorporate any relevant arguments" from their response brief  "to the extent that the Court construes anything in Nautilus's motion for partial summary judgment against Heartland's Counterclaim as touching on th[ose] issues."[137]  Accordingly, Nautilus's motion for partial summary judgment as to Heartland's Counterclaim is essentially unopposed.

In Count I of its Counterclaim, Heartland asserts that the definitions of "property damage" and "occurrence" under the Policies require indemnification.  However, as set forth above, Nautilus only argued that the definitions of "property damage" and "occurrence" were not met with respect to categories of damages that are no longer contested (*i.e.*, damages for Heartland's breach of the Construction Agreement, violation of the KCPA, and attorneys' fees

---

[136] Doc. 36 at 8 n.3.

[137] Doc. 42 at 31.

and costs awarded pursuant to the KCPA).  The parties do not dispute that the definitions of "property damage" and "occurrence" are met with respect to the negligence damages discussed above, and the Court therefore assumed coverage before considering whether exclusions apply. Accordingly, the Court finds as moot Nautilus's motion for partial summary judgment on Count I of Heartland's Counterclaim.

Count II of Heartland's Counterclaim alleges that an exception to one of the Policies' "business risk" exclusions requires coverage.  Specifically, Heartland relies on the exception to Exclusion l, "Damage to Your Work," which provides that coverage does not apply to:

> "Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
>
> This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.[138]

Heartland contends that because the work at issue was negligently performed by Heartland's subcontractors, Exclusion l does not apply and coverage is required.  Nautilus counters that it has not relied on this exclusion in arguing that Heartland lacks coverage; rather, it relies on other exclusions that do not include exceptions for work performed by subcontractors.  Nautilus is correct that "[t]he subcontractor exception does not *create* coverage.  Only the basic insuring agreement can do that."[139]  And "[t]he inapplicability of one exclusion will not reinstate coverage where another exclusion has precluded it."[140]  Because Exclusion l does not create

---

[138] Doc. 7-6 at 22; Doc. 7-7 at 22.

[139] *Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 882 F.3d 952, 956 (10th Cir. 2018) (emphasis added).

[140] *Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 137 P.3d 486, 490 (Kan. 2006) (citation omitted).

coverage, Nautilus's motion for partial summary judgment is granted as to Count II of Heartland's Counterclaim.

**IT IS THEREFORE ORDERED** that Plaintiff Nautilus's Motion for Partial Summary Judgment (Doc. 35) is **found as moot in part, granted in part, and denied in part**.

Nautilus's motion is **found as moot as to Count I** of its Amended Complaint (alleging no "property damage" within the meaning of the Policies), **Count II** of its Amended Complaint (alleging no "occurrence" within the meaning of the Policies), and **Count V** of its Amended Complaint (alleging that the "expected injury" exclusion bars coverage). Nautilus's motion is also **found as moot as to Count I of Heartland's Counterclaim** (alleging that the definitions of "property damage" and "occurrence" under the Policies require indemnification).

Nautilus's motion is **granted as to Count II of Heartland's Counterclaim** (alleging that Exclusion l requires coverage).

Nautilus's motion is **granted in part and denied in part as to Count III** of its Amended Complaint (alleging that multiple "business risk" exclusions preclude coverage). The motion is **granted** with respect to Nautilus's request for declaratory judgment that Heartland lacks coverage for the grading damages of $57,959.38. The motion is **denied** as to the framing damages. Coverage for those damages is not precluded under Exclusion k or Exclusion m. As to Exclusions j(5) and (6), while lack of coverage for removal and replacement of the TJI rafters is deemed established in this case pursuant to Rule 56(g), the total scope of "that particular part" on which Heartland was performing operations at the time the property damage occurred, and what portion of the $95,000 in framing damages is properly attributed to "that particular part," shall be determined at trial.

Finally, Nautilus's motion for partial summary judgment is **denied as to Count VI** of its

Amended Complaint (alleging that the limitation of coverage endorsements bar coverage).

**IT IS SO ORDERED.**

Dated: <u>March 11, 2021</u>

         <u> S/  Julie A. Robinson   </u>
         JULIE A. ROBINSON
         CHIEF UNITED STATES DISTRICT JUDGE